**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
ELKINS**


**STANLEY DEMERE,**

     Petitioner,

**v.**                                    **Civil Action No. 2:09cv83
(Judge Bailey)**

**WARDEN DAVID BALLARD,**

     Respondent.


**ORDER ADOPTING REPORT AND RECOMMENDATION**

**I.**    **Introduction**

On this day, the above-styled matter came before this Court for consideration of the

Report and Recommendation of United States Magistrate Judge James E. Seibert [Doc.

67]. By Local Rule, this action was referred to Magistrate Judge Seibert for submission of

a report and a recommendation ("R&R"). Magistrate Judge Seibert filed his R&R on July

29, 2013. In that filing, the magistrate judge recommends that this Court either dismiss this

case because it is a "mixed petition" or, in the alternative, to permit the petitioner to elect

to sever his unexhausted claims and seek review of his one fully exhausted claim. On

August 8, 2013, the petitioner filed his Motion to Sever Unexhausted Claims [Doc. 69].

**II.**    **Standard of Review**

Pursuant to 28 U.S.C. § 636(b)(1)(c), this Court is required to make a *de novo*

review of those portions of the magistrate judge's findings to which objection is made.

However, the Court is not required to review, under a *de novo* or any other standard, the

factual or legal conclusions of the magistrate judge as to those portions of the findings or recommendation to which no objections are addressed.  *Thomas v. Arn*, 474 U.S. 140, 150 (1985).  In addition, failure to file timely objections constitutes a waiver of *de novo* review and the right to appeal this Court's Order.  28 U.S.C. § 636(b)(1); *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).  Here, objections to Magistrate Judge Seibert's R&R were due within fourteen (14) days of receipt, pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure.  The petitioner instead has opted to file his Motion to Sever Unexhausted Claims [Doc. 69], which in essence adopts the magistrate judge's recommendation to proceed on the exhausted claims.  This Court notes that the Motion to Sever does, however, take issue with the magistrate judge's scope as to which claims are exhausted.  The remainder of the R&R will be reviewed for clear error.

### III.    Factual and Procedural History

Petitioner Stanley Demere was convicted of first degree murder following a three-day trial for the murder of his estranged wife, Bonnie Demere.  On February 9, 2006, Demere was sentenced to life without parole.  Petitioner Demere has filed a direct appeal, two state petitions for writ of habeas corpus, and has appealed the denials of both state habeas petitions.  After a review of each of those proceedings and the instant petition, the magistrate judge determined that only one of the petitioner's claims is exhausted, Ground Two, a claim petitioner raised on direct appeal, in his first state habeas and again on appeal of that state habeas petition.  The magistrate judge found that most of the claims raised in petitioner's instant federal habeas petition were never raised before the West Virginia

2

Supreme Court of Appeals in the form he now raises them and some were never raised at all; therefore, they are not exhausted because petitioner still has a remedy available in state court for them.  Specifically, the magistrate judge found the following with regard to the only fully exhausted claim:

**Ground Two** (denial of the opportunity to present a defense of third party guilt) was raised on direct appeal (as #1), and raised (as #3) in petitioner's first state habeas and the appeal of the denial of the same (as # 3).  Accordingly, this claim is **exhausted**.

See [Doc. 67 at 21].

In his Motion to Sever Unexhausted Claims [Doc. 69], the petitioner also asserts the following claims of ineffective assistance of counsel are exhausted:

1) Trial Counsel was ineffective for failing the address the issue of mercy;

2) Trial Counsel was ineffective for failing to object to the State's introduction of a statement made by the Petitioner's son, Stanley Irvin Demere, when the State did not call Stanley Irvin Demere as a witness;

3) Trial counsel was ineffective for failing to request that the Court perform a balancing test pursuant to Rule 403 of the West Virginia Rules of Evidence in order to balance the probative value against the prejudicial impact of certain statements made by the petitioner;

4) Trial counsel was ineffective when he called Ruthlene Hinkle as a witness;

5) Trial counsel was ineffective when the failed to establish that Billy Sites had a greater opportunity to murder Mrs. Demere before be went to Harrisburg, Va., rather than after he went to Harrisburg, Va.;

6) Trial counsel was ineffective when George I. Sponaugle III made the final closing argument instead of George I Sponaugle, II; and

7) Trial counsel was ineffective when he failed to adequately address the issue of

3

admission into evidence of two guns owned by the petitioner, neither of which the state could prove were the murder weapon.

Additionally, the petitioner seeks to include the following two claims, which the magistrate judge found to be related to the above seven claims:

1(k)   Counsel failed to properly advise and instruct petitioner on his right to file a motion to bifurcate the trial before trial commenced, preventing petitioner from being able to seek mercy, if the jury would grant mercy;

1(c)   Counsel was deficient in arguing against the admissibility of two guns alleged to both be and not be the murder weapon causing the jury to guess and speculate as to which gun could have or might have been the murder weapon.

## IV.   Exhaustion Requirements

A petition for a writ of habeas corpus is not a substitute for pursuing state judicial remedies.  See 28 U.S.C. § 2254(b).  Absent a valid excuse, a petition for writ of habeas corpus should not be entertained unless the petitioner has first exhausted his state remedies.  *Castille v. Peoples*, 489 U.S. 346, 349, *reh'g denied*, 490 U.S. 1076 (1989).  To exhaust state remedies, a habeas petitioner must fairly present the substance of his claim to the state's highest court.  *Matthews v. Evatt*, 105 F.3d 907 (4th Cir. 1997), *cert. denied*, 522 U.S. 833 (1997).  "A claim is fairly presented when the petitioner presented to the state courts the substance of his federal habeas corpus claim.  The ground relied upon must be presented face-up and squarely; the federal question must be plainly defined." *Id*. at 911.  "A litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state-court petition or brief . . . by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal

4

grounds, or by simply labeling the claim 'federal.'"  **Baldwin v. Reese**, 541 U.S. 27, 32 (2004); *see also* **Howell v. Mississippi**, 543 U.S. 440, 444 (2005).

In West Virginia, the exhaustion of state remedies is accomplished by a petitioner raising the federal issue on direct appeal from his conviction or in a post-conviction state habeas corpus proceeding followed by an appeal to the West Virginia Supreme Court of Appeals.  *See* **Moore v. Kirby**, 879 F.Supp. 592, 593 (S.D. W.Va. 1995); *see also* **Bayerle v. Godwin**, 825 F.Supp. 113, 114 (N.D. W.Va. 1993).  A federal court may only consider those issues the petitioner presented to state court, and "[a]n applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented."  28 U.S.C. § 2254(c).

In addition, it is petitioner's burden to demonstrate that he has exhausted his state judicial remedies.  **Breard v. Pruett**, 134 F.3d 615, 619 (4th Cir. 1998), *cert. denied*, 523 U.S. 371 (1998).  "The exhaustion requirement is not satisfied if the petitioner presents new legal theories or factual claims for the first time in his federal habeas petition."  **Id**.  "If state courts are to be given the opportunity to correct alleged violations of prisoners' federal rights, they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution.  If a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal court, but in state court."  **Duncan v. Henry**, 513 U.S. 364, 365 (1995).  Further, in addition to providing the state court with the facts supporting the claimed constitutional violation, the petitioner must also "explain how

those alleged events establish a violation of his constitutional rights." **Mallory v. Smith**, 27 F.3d 991, 994 (4th Cir. 1994). Finally, a petitioner must show that the claims he raised in the state proceedings are the exact same claims he is raising in a federal habeas petition. *See* **Pitchess v. Davis**, 421 U.S. 482, 487 (1975); *see also* **Picard v. O'Connor**, 404 U.S. 270, 275 - 76 (1971). "It is not enough that all the facts necessary to support the federal claims were before the state courts, or that a somewhat similar state-law claim was made." **Anderson v. Harless**, 459 U.S. 4, 6 (1982)(internal citations omitted). Not only must the claim itself be the same, but the same factual grounds must be raised in support of the claims in state court as in federal court, and a specific federal constitutional claim must be raised in the state proceedings. *Id*.

## V.   Analysis

### A.   Ground One

With regard to petitioner's Ground One in the instant petition, the magistrate judge found as follows:

> Ground One (ineffective assistance of counsel) ("IAC")) against trial counsel was not raised on direct appeal, but was raised in petitioner's first state habeas petition (as #2) and its appeal to the WVSCA (as #1). However, in petitioner's first state habeas petition, he raised 8 separate claims of IAC, only 7 of which he raised in the appeal of its denial to the WVSCA. While he again raises IAC claims against trial counsel in the instant federal petition, they are claims as to 11 *other* issues, 9 of which were never raised before, and 2 of which are related, but are different claims (Claim 2(a) and Claim 2(h)) than what were raised in his first state habeas petition. To further add to the confusion, he did not raise one of them on appeal of his first state

habeas (Claim 2(a)), thus, even if it could be liberally construed as the same claim he is raising now, it is not exhausted for that reason as well.  While it is true that petitioner was granted a stay and abeyance to exhaust his claims, and he did raise IAC claims in his second state habeas petition and its appeal, he did not raise them against *trial* counsel, only against his original habeas counsel.  Thus, **all of petitioner's §2254 IAC claims against *trial* counsel remain**, and are **not exhausted**, because he still has a potential remedy available in state court with regard to them.

See [Doc. 67 at 21].

The petitioner, in his Motion to Sever Unexhausted Claims, attempts to salvage this procedural default by citing to a recently decided United States Supreme Court opinion, ***Trevino v. Thaler***, 133 S.Ct. 1911 (2013), which held that where "state procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance at trial counsel on direct appeal . . . '[a] procedural default will not bar a federal habeas court from hearing a substantial claim of ineffective assistance at trial if, in the initial review collateral proceeding, there was no counsel or counsel in that proceeding was ineffective.' 132 S.Ct. at 1320."  The Supreme Court further stated:

[W]e pointed out that "[t]he doctrine barring procedurally defaulted claims from being heard is not without exceptions. A prisoner may obtain federal review of a defaulted claim by showing cause for the default and prejudice from a violation of federal law." ***Id.***, at 1316. And we turned to the issue directly before the Court: whether ***Martinez*** had shown "cause" to excuse his state procedural failing. ***Id.***, at 1320–1321.

Martinez argued that his lawyer should have raised, but did not raise, his claim of ineffective assistance of trial counsel during state collateral

review proceedings. *Id.*, at 1214–1315. He added that this failure, itself amounting to ineffective assistance, was the "cause" of, and ought to excuse, his procedural default. *Id.*, at 1314–1315. But this Court had previously held that "[n]egligence on the part of a prisoner's postconviction attorney does not qualify as 'cause,'" primarily because a "principal" such as the prisoner, "bears the risk of negligent conduct on the part of his agent," the attorney. *Maples v. Thomas*, 132 S.Ct. 912, 922 (2012) (quoting *Coleman*, *supra*, at 753–754, 111 S.Ct. 2546; emphasis added). *Martinez*, in effect, argued for an exception to *Coleman*'s broad statement of the law.

We ultimately held that a "narrow exception" should "modify the unqualified statement in *Coleman* that an attorney's ignorance or inadvertence in a postconviction proceeding does not qualify as cause to excuse a procedural default." *Martinez*, at 1315. We did so for three reasons. First, the "right to the effective assistance of counsel at trial is a bedrock principle in our justice system.... Indeed, the right to counsel is the foundation for our adversary system." *Id.*, at 1317.

Second, ineffective assistance of counsel on direct appellate review could amount to "cause," excusing a defendant's failure to raise (and thus procedurally defaulting) a constitutional claim. *Id.*, at 1316–1317. But States often have good reasons for initially reviewing claims of ineffective assistance of trial counsel during state collateral proceedings rather than on direct appellate review. *Id.*, at 1317–1318. That is because review of such a claim normally requires a different attorney, because it often "depend[s] on evidence outside the trial record," and because efforts to expand the record on direct appeal may run afoul of "[a]bbreviated deadlines," depriving the new attorney of "adequate time ... to investigate the ineffective-assistance claim." *Id.*, at 1318.

Third, where the State consequently channels initial review of this constitutional claim to collateral proceedings, a lawyer's failure to raise an

ineffective-assistance-of-trial-counsel claim during initial-review collateral proceedings, could (were **Coleman** read broadly) deprive a defendant of any review of that claim at all. **Martinez**, *supra*, at 1316.

We consequently read **Coleman** as containing an exception, allowing a federal habeas court to find "cause," thereby excusing a defendant's procedural default, where (1) the claim of "ineffective assistance of trial counsel" was a "substantial" claim; (2) the "cause" consisted of there being "no counsel" or only "ineffective" counsel during the state collateral review proceeding; (3) the state collateral review proceeding was the "initial" review proceeding in respect to the "ineffective-assistance-of-trial-counsel claim"; and (4) state law requires that an "ineffective assistance of trial counsel [claim] ... be raised in an initial-review collateral proceeding." **Martinez**, *supra*.

**Trevino v. Thaler**, 133 S.Ct. 1911, 1916 - 1918.

As previously mentioned, in West Virginia, the exhaustion of state remedies is accomplished by a petitioner raising the federal issue on direct appeal from his conviction or in a post-conviction state habeas corpus proceeding followed by an appeal to the West Virginia Supreme Court of Appeals.  *See* **Moore v. Kirby**, 879 F.Supp. 592, 593 (S.D. W.Va. 1995); *see also* **Bayerle v. Godwin**, 825 F.Supp. 113, 114 (N.D. W.Va. 1993).  A federal court may only consider those issues the petitioner presented to state court, and "[a]n applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented."  28 U.S.C. § 2254(c).

The petitioner has simply failed to avail himself of this process.  While the petitioner continues to claim his first state *habeas* counsel was ineffective, he has failed to exhaust

his claims that *trial* counsel was ineffective.  This Court previously stayed this matter to allow the petitioner to raise the above grounds in a second state habeas proceeding; however, he failed yet again to do so, instead only raising his claim that his first state habeas counsel was ineffective.  Therefore, petitioner's above claims against *trial* counsel remain unexhausted.  It is clear that the petitioner knew which claims were not exhausted, yet he only raised one claim in his second state habeas petition.  Accordingly, this Court finds that ***Trevino v. Thaler*** is not applicable under these circumstances, and this Court cannot excuse the petitioner's procedural default.  Accordingly, this Court finds that the nine claims raised in his Motion to Sever [Doc. 69] are procedurally barred.  Therefore, the same are hereby **DISMISSED**.

      B.    Ground Two

      Having determined that the only remaining claim is Ground Two, this Court will now undertake a full review of the same on the merits.  The magistrate judge found the following as to the scope of Ground Two:

**Ground Two:** Whether Petitioner's Fourteenth Amendment right to due process, his Sixth Amendment right to confront witnesses and the Supreme Court's holding in ***Crawford v. Washington***, 541 U.S. 36 (2004), was violated when the state Circuit Court denied him the opportunity to present a complete defense by holding that his evidence of third party guilt was inadmissible.

      Petitioner contends that the evidence upon which he was convicted of murdering his estranged wife was wholly circumstantial, and that there was no direct evidence linking him to the crime.  He argues that the murder was committed by a third party, Billy Sites, a man with whom his estranged wife was allegedly having an affair.  The record reflects that because Billy Sites passed a lie detector test, exonerating him as a suspect in the murder,

10

and had an airtight alibi for the day of the murder, the court granted the State's motion in limine, and refused to permit the defense to be presented to the jury.[1]  Instead, the court permitted the defense to vouch the record, outside of the jury's presence, to obtain the testimony of Sites and other witnesses whose testimony would allegedly support petitioner's position.

Petitioner contends that Sites and his wife were having an affair, and became estranged several weeks before her death, and that witnesses Larry Joe Meadows, his wife Gladys Meadows, their son Daniel Meadows, who lived across the road from her, and Janet Thompson, whose daughter was the mother of  Bonnie Demere's grandson, would testify that Sites had been stalking Bonnie during the month before her murder. Additionally, petitioner contends that Sites had threatened to kill Bonnie during Thanksgiving week that year, that Bonnie had told Janet Thompson she was afraid of Sites and that he had hit her in the past, and he was stalking her.  Petitioner contends that Sites lied under oath and admitted lying to the police, Sites was found to have a .22 caliber firearm in his vehicle when he was stopped by the police the morning after Bonnie was killed, and Sites filed a claim against Bonnie's estate for the cost of the home he was building for her on a lot he had purchased.

The evidence at trial was uncontradicted that for the three years preceding her death, Bonnie Demere regularly worked as a housekeeper, cleaning for Dr. Sebastian, the physician at whose home she was murdered, every Wednesday morning, from 7:30 a.m.

---

[1] Doc. 59-6 at 20 – 21.

until 11:30 a.m.[2]  Sebastian testified that she never stayed past 11:30 a.m.[3]  Testimony

from Bill Sites, vouched to the record, indicated that Bonnie had another regular cleaning

job for a woman named Marie every Wednesday afternoon.[4]  Dr. Sebastian also testified

that Bonnie arrived the day of the murder at her usual time, around 7:30 a.m., and that he

left the house at 7:48 a.m.[5]  When he returned at 3:00 p.m. to find her car still in the

driveway and her body on his living room floor, he noticed that she had gotten very little of

her cleaning done,[6] indicating she was killed shortly after he left.  Sebastian, although a

medical doctor, did not opine as to the time of Mrs. Demere's death, but testified that the

blood around the body was dark, hardened and caked, as if it had "clearly [been] there for

a while,"[7] and the body was cold, quite stiff, and "completely rigid," when he felt for a pulse

– indicating that rigor mortis was already well underway by 3:00 p.m.[8]  Another witness

testified that it was 38 degrees outside that day.[9]  However, Dr. Sebastian further testified

that the living room where he found the body was warm, probably around 75 degrees.[10]

---

[2] Doc. 56-1 at 100.

[3] Id. at 100.

[4] Doc. 56-6 at 111-12.

[5] Doc. 56-2 at 1.

[6] Id. at 3 – 4, 6.

[7] Id. at 4.

[8] Id. at 4, 12.

[9] Doc. 56-3 at 43.

[10] Doc. 56-2 at 12.

Joseph Benkert, a paramedic and a county medical examiner who responded within a few minutes after 3:00 p.m. to Dr. Sebastian's 911 call[11] testified that the body was "very stiff" and cool, the blood from the gunshot wounds was hardened, caked and dry,[12] indicating that Bonnie Demere had been dead for "a considerable amount of time."[13]  He also testified that the room the body was found in was warm.[14]

Senior Trooper A.D. Teter of the West Virginia State Police received a call to the scene at 3:04 p.m.  Upon arrival, he also noted that the blood surrounding the body was dried and dark, "like it had been clotting for a time."[15]  He testified that the body was "cold and rigid."[16]

Trial testimony of the forensic pathologist from the Office of the State Medical Examiner in Charleston, West Virginia who performed the autopsy indicated that rigor mortis begins immediately after death but is not detectable except perhaps in small facial muscles for the first hour or two,[17] rigidity is apparent in the major muscles at four - six hours post-death,[18] and full rigor is achieved at twelve hours post-death,[19] assuming the

---

[11] Id. at 5, 22.

[12] Id. at 26.

[13] Id. at 23-24, 26.

[14] Id. at 24.

[15] Doc. 56-3 at 18.

[16] Id. at 18.

[17] Doc. 56-4 at 52, 57, 58, 59.

[18] Id. at 52, 57, 59.

[19] Id. at 57.

body is kept at normal room temperature of 70 – 75 degrees.[20]  He testified that the death report from the County Medical Examiner indicated that the body was discovered in a room with normal temperature[21] and rigor was already obvious and significant when found;[22] that the rigor was so advanced by 9:15 p.m. that evening, when Rick Adkins, the Pendleton County Medical Examiner first examined it to prepare a Death Report, that rigor had to be broken in the arms to permit the body to be fit into a body bag for transport to the State Medical Examiner's Office.[23]  Based on all available evidence, and the fact that full rigor is achieved within twelve hours post-death at normal room temperatures, he opined that the time of death was between 8:00 a.m. - 11:00 a.m.[24]

The record reveals that petitioner lived on Siple Mountain Road, some five or six miles from Dr. Sebastian's home.[25]  He was seen driving west on  Siple Mountain Road in the direction of Sebastian's home, but about 3 – 4.5 miles before it, at approximately 8:35 a.m. on the day of the murder.[26]  Upon being called to come to the police station to make a statement that evening, he originally denied having seen or spoken to Bonnie that day.[27]  However, in the statement he gave to the State Police that evening, he admitted going to

---

[20] Id. at 56-4 at 44, 53, 54, 57, 62.

[21] Id. at 44.

[22] Id. at 42.

[23] Doc. 56-3 at 46 – 47; 56-4 at 49.

[24] Doc. 56-4 at 46 – 48.

[25] Doc. 17-11 at 20.

[26] Doc. 56-2 at 41 – 43, 46 – 47.

[27] Doc. 56-3 at 21, 40 – 43.

Sebastian's that morning, knowing Bonnie worked there, alone, every Wednesday morning,[28] ostensibly to resolve a conflict over a hotly contested issue in their divorce, over the custody of two dogs.[29]  He admitted walking in without knocking and surprising her,[30] but asserted that they amicably discussed and resolved the issue of when she would get to have the dogs; then he left.[31]  The physical evidence at the scene showed she was killed "execution style."[32]  After she was shot the first time, and was apparently on her hands and knees, crawling, to get away, she was then shot a second and third time.[33]

Petitioner did not testify at trial.  West Virginia State Police Sgt. Charlie Trader testified at trial about petitioner's statement to the police the evening of the murder, saying that before petitioner gave his statement, he volunteered that he "knew that he was the number one suspect," and said "I'm glad the bitch is dead.  What's the saying, thank God the bitch is dead."  Further, he told Trader that "he had thought long and hard on how he could kill the victim and get away with it."[34]  Trader testified that petitioner's demeanor during questioning was "kind of arrogant . . . when I'd ask him a question he would . . . smirk or like if I'd ask him a question directly pertaining to - - to the scene he would kind of make a noise like (indicated kind of noise. . . ) and sit back and put his hands together and

---

[28] Doc. 56-2 at 61.

[29] Id. at 61, 62, 66, and 64- 65.

[30] Id.

[31] Id.

[32] Doc. 17-11 at 21.

[33] Id. at 22.

[34] Doc. 56-2 at 55 – 56.

kind of smirk at me.  Just in an irritating way."[35]  Trader commented that he was sorry that the video recording system was not operable that day, in order to capture the petitioner's demeanor.[36]

In his statement, petitioner advised that he had arrived at Dr. Sebastian's around 9:00 a.m. and left ten or fifteen minutes later.[37]  He denied killing Bonnie Demere,[38] denied having anyone else kill her,[39] admitted having thought of killing her,[40] but denied that he had ever threatened to kill her.[41]  However, testimony from Sgt. Charlie Trader regarding an investigation by Pendleton County Deputy Sheriff Chad Bowers of a November 19, 2004, domestic incident between Bonnie and the petitioner, wherein petitioner pulled a gun on Bonnie and threatened her with it,[42] nineteen days before the murder, when Bonnie went to collect two dogs from petitioner's house pursuant to a court order in the divorce proceedings giving them shared custody of the dogs on alternating weeks, indicates petitioner admitted brandishing a gun at Bonnie to keep her from taking the dogs. When asked by Deputy Bowers what he intended to do with the gun, petitioner replied "I told her

---

[35] Doc. 56-2 at 55 – 56, 56-3 at 28.

[36] Doc. 56-3 at 11 – 12.

[37] Doc.  56-2 at 61 - 63.

[38] Id. at 67.

[39] Id. at 68.

[40] Id. at 67.

[41] Id. at 62.

[42] Doc. 56-3 at 20.

I'd blow her . . . I'd blow her fuckin' brains out if she took my dogs."[43]  Moreover, Dr. Sebastian also testified that Bonnie had confided that she was afraid of petitioner and that he had threatened to kill her more than once.[44]  Testimony from Ruthlene Hinkle, Bonnie's son's mother-in-law, who accompanied Bonnie on her November 19, 2004, attempt to take the dogs, called as a defense witness, elicited an admission that petitioner was not about to let Bonnie take the dogs "under any circumstances."[45]

A thorough review of the record indicates that the overwhelming, unrebutted evidence, vouched onto the record at trial, from Sites himself,[46] and multiple other witnesses, was that Sites had a solid alibi from 7:30 a.m., when he left Franklin, West Virginia to travel to Harrisonburg, Virginia, an hour away from the murder scene, until at least approximately 1:50 p.m.[47] and probably later.[48]  That evidence included testimony from witnesses who met or spoke with him there, contemporaneously created credit card records, sales receipts and cell phone records that corroborated Sites' vouched testimony that he was at various locations in Harrisonburg, Virginia most of the day,[49] thus excluding

---

[43] Doc. 56-2 at 67.

[44] Id. at 10 – 11.

[45] Doc. 56-5 at 11.

[46] Sites himself was extremely vague and inaccurate as to his arrival and departure times, but other witnesses who saw him there, as well as his paper and cell phone records, corroborate the times given by witnesses, show his movements that day conclusively proved he left Franklin at 7:30 a.m. and could not have returned before much before 2:00 p.m., if at all.

[47] Doc. 56-6 at 91 - 92, 95, 97-98,  101, 102, 104, 105 - 08, 109- 110, 121, 123, and 124.

[48] Id. at 92 - 93, 97-98, 108.

[49] Doc. 56-6 at 90 – 92, 95- 96, 101 – 02, 104 - 05, 106-08,  and 109-110.

him as a suspect.  Evidence proved that the murder was committed between 8:00 – 11:00 a.m. that day.[50]

Based on a thorough review of the evidence, the undersigned agrees with the State that Sites could not have killed Bonnie Demere before he went to Harrisonburg, because there was uncontradicted evidence, stipulated to the record, that Sites had met with Ronald King, an employee at the Smith Creek building site of a house being built for Bonnie Demere, in Franklin, West Virginia, between 7:15 – 7:30 a.m., when Sites indicated to King he was leaving to go to Harrisonville, VA.[51]  The testimony of Christopher Russell, owner and sales manager of Valley Custom Homes, Harrisonville, VA, also vouched to the record that Sites met him there a few minutes before or after 8:30 a.m., to discuss getting Bonnie's new modular home set on its foundation.[52]  Other testimony vouched to the record was that it took one hour to drive from Franklin, WV to Harrisonburg, VA.[53]  Thus, in order to have arrived at Russell's office at 8:30 a.m., Sites would have had to kill Bonnie before he met with King at 7:15 a.m., contradicting petitioner's own statement to the police saying he met with Bonnie Demere at Sebastian's around 9:00 a.m. and left her there, alive, at around 9:15 a.m., and Dr. Sebastian's testimony to the effect that she arrived at his house at 7:30 a.m., and she was alive when he left at 7:48 a.m.  Likewise, this scenario also contradicts the testimony vouched to the record by Mr. and Mrs. Meadows, to the effect that they saw

---

[50] Doc. 56-4 at 46.

[51] Doc. 56-6 at 116 – 117.

[52] Id. at 123.

[53] Id. at 90.

Bonnie alive as late as 8:30 – 9:00 a.m. (Mrs. Meadows) or 9:00 – 9:30 a.m. (Mr. Meadows) at their house "before she left for work" on the day of the murder, when she allegedly came to their door to get a spare key, after locking hers in the house.[54] Testimony given at trial indicated it was a 20-23 minute drive from there to Sebastian's house;[55] accordingly, if the Meadows couple were to be believed,[56] Bonnie Demere was still alive either until almost 9:00 a.m., twenty-three minutes away from where petitioner says he saw her for fifteen minutes, or until almost 10:00 a.m., contradicting petitioner's own claim that he saw her at Sebastian's house for fifteen minutes, beginning at around 9:00 a.m. and ending approximately fifteen minutes later.  In either case, Sites had an airtight alibi for the entire morning and early afternoon in Harrisonburg.

Further, Sites could not have killed Bonnie after he returned from Harrisonburg, because testimony from witnesses who saw or spoke to him there was corroborated by contemporaneously-created sales receipts and cell phone records, proving he was there until at least 12:50 p.m. (and probably later).  Testimony at trial was that it was an hour's drive from Harrisonburg, Virginia to Franklin, West Virginia; thus, Sites could not have gotten back to Franklin before much before 2:00 p.m., if at all.[57]  By the time Dr. Sebastian

---

[54] Doc.  56-5 at 15 – 17, 19 – 23.

[55] Id. at 25 – 26.

[56] Neither of the Meadows testified that they actually looked at the clock to verify the time; their claim as to the time was based on the fact that Bonnie arrived at their door at the time Mr. Meadows "usually" woke up.

[57] It was Sites' testimony that he visited WalMart in Harrisonville after his last purchase at Lowe's in Harrisonville at 12:50 p.m. and spent about 45 – 60 minutes there before beginning the drive back to Franklin, WV, but he had not yet located the WalMart sales receipt.  Doc. 56-6 at 92, 97-98, and 108.

found her body at 3:00 p.m., it was already cold and well into rigor mortis, and the blood was dry and congealed, indicating she had been dead far longer than one hour or less. Finally, petitioner's contention that the death occurred after Dr. Sabet's latest estimation fails to consider that Bonnie Demere never stayed at Dr. Sebastian's past 11:00 a.m.

Here, the undersigned finds that the petitioner has not met his burden of rebutting by clear and convincing evidence the presumption that the trial court's ruling prohibiting the introduction of third-party guilt was an unreasonable determination of the facts.   To the contrary, the undersigned agrees with the trial court's summarization of the evidence as to third party guilt, outside of the jury's presence:

> . . . it would appear from the - - testimony and the evidence that was presented during the vouching of the record here today outside of the presence of the jury that there's no additional evidence that would be anything more than speculative.  Even if there was a threat made by Mr. Sites against the victim, there's no evidence that he was there at the time of . . . her murder.  It appears – and there's basically been no contrary evidence that he was in Harrisonburg from 8:30 in the morning until at least 12:50 in the afternoon…he left here …about 7:30 at the house site on Airport Hill and obviously went to Harrisonburg because he arrived there according to Mr. Russell at about 8:30 and he has records indicating that he was at other places in the Harrisonburg area from that time until at least 12:50 pm.  It appears from the evidence in this case that the murder took place sometime in the …morning hours, according to the doctors even more earlier than --- … much earlier than 12:50.  It appears that it takes approximately an hour from Franklin to Harrisonburg and so that would have put him back here no earlier than 1:50, 2:00 o'clock in the afternoon.   His testimony is that it was later than that.  So at this . . . time the Court's ruling would remain the same

based upon the fact that the evidence presented by the Defendant is mere speculation as pointing the finger to anyone else, particularly Mr. Sites.[58]

Moreover, despite petitioner's attempt to insinuate that Sites had motive to kill Mrs. Demere because of an alleged recent estrangement between the two, the testimony from witnesses in support of that theory vouched to the record was either obviously biased, contradictory, less than credible, and in direct contradiction to other, more reliable evidence already in the record.  Moreover, Sites' behavior, spending the entire day of the murder running various errands on Bonnie Demere's behalf, purchasing and/or picking up items for the construction and furnishing of her new home, even using a check signed by her the evening before,[59] to pay for major appliances she had ordered, as well as driving her mother to a doctor's appointment the next day[60] is completely inconsistent with that of someone who was "completely estranged" from her.

Here, the petitioner's claim was properly presented to the courts of the State. Because the petitioner's claim was adjudicated on the merits in State court, the State's findings of fact and conclusions of law are due the appropriate deference.  Having fully reviewed the remaining claim, Ground Two, this Court is of the opinion that the same should be, and is hereby **DENIED**.

## V.    <u>Conclusion</u>

---

[58] Doc. 56-6 at 125-26.

[59] Id. at 92, 95 - 96; 56-6 at 106-08.

[60] Sites had not yet learned of Bonnie's murder, when he drove her mother to the doctor's the morning after the murder. Doc. 56-6 at 81.

Upon careful review of the report and recommendation, it is the opinion of this Court that the magistrate judge's Report and Recommendation **[Doc. 67]** should be, and is, hereby **ORDERED ADOPTED** for the reasons more fully stated in the magistrate judge's report.  The petitioner's Motion to Sever Unexhausted Claims **[Doc. 69]** is **GRANTED**. Having fully reviewed the petitioner's one unexhausted claim, Ground Two, this Court finds the same lacks merit and is hereby **DENIED**.  Accordingly, the Respondent's Motion for Summary Judgment and Renewed Motion to Dismiss **[Doc. 59]** is **GRANTED**.  Finally, this Court hereby **DISMISSES** the petition **[Doc. 1] WITH PREJUDICE** and **ORDERS** that this matter be **STRICKEN** from the active docket of this Court.  The Clerk is **DIRECTED** to enter judgment in favor of the respondent.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to any counsel of record and to mail a copy to the *pro se* petitioner.

**DATED:** September 24, 2013.

JOHN PRESTON BAILEY
UNITED STATES DISTRICT JUDGE